of that engineer, which prevented the consummation of that contract, furnishes no reason why the plaintiff should not now receive the real value of its property as ascertained from data furnished by the city itself.

The judgment should be affirmed, with costs. All concur.

(44 Misc. Rep. 594.)

SMITH v. HAVENS RELIEF FUND SOC. et al.

(Supreme Court, Special Term, New York County. August, 1904.)

1. CHARITABLE ASSOCIATION—INCORPORATION.

A certificate of incorporation provided that the objects of the society should be the receipt of money and property contributed or devised, the investment of the same, and the application of the income to the relief of poverty and distress, and generally to act in respect to any property received by deed or will for any charitable use or purpose. *Held*, that the objects of the society were benevolent and charitable within Laws 1848, p. 447, c. 319, § 1, providing for associations for benevolent or charitable purposes.

2. SAME—CONSTRUCTION OF CHARTER.

A corporation organized to receive contributions and devises of money and property, and the investment of the same to produce an income, and the application of the income through corporate or private agencies to the relief of poverty and distress, did not involve the delegation by the corporation of the discretionary power of selection of its beneficiaries.

3. SAME—VALIDATING INCORPORATION.

Laws 1871, p. 601, c. 301, passed four months after the filing of certificate of incorporation of a benevolent society, for the purpose of removing the limit to the amount of property which the society might take, containing a recital of the purposes of the society as stated in its certificate of incorporation, rendered such incorporation valid if there was any invalidity in the original incorporation, or else created a valid incorporation in the first instance.

4. CHARITY—WHAT CONSTITUTES.

A charity is an undertaking contemplating public benefits of the community or a class as contrasted with a benevolent use for a private purpose or private individual.

5. CHARITABLE ASSOCIATION—DEFINING BENEFICIARIES.

It is unnecessary, in the incorporation of a charitable society, that the ultimate recipients of the bounty of the society be precisely defined.

6. CORPORATION—POWERS OF LEGISLATURE.

It being within the power of the Legislature to prescribe the formalities necessary to the formation of a corporation, it can legalize a corporation whose organization was defective through failure to comply with those requirements.

7. SAME—GRANT OF FRANCHISE.

To affect the grant of a corporate franchise no certain terms are necessary, in the absence of a constitutional requirement.

8. SAME—TERMS.

In an act conferring the right to exercise a corporate franchise the use of the word "incorporate," or a similar expression, is unnecessary where the intent to confer the right is sufficiently shown.

9. SAME—GENERAL LAWS.

Const. art. 8, § 1, providing for the formation of corporations under general laws, and that they shall not be created by special act except for

¶ 6. See Corporations, vol. 12, Cent. Dig. § 71.

municipal purposes, or where, in the view of the Legislature, the objects of the corporation cannot be attained under general laws, is not mandatory in requiring corporations to be formed under the general laws.

**10. SAME—SPECIAL ACT.**

Under Const. art. 8, § 1, providing that the Legislature may, when necessary to attain certain objects, create a corporation by special act, the necessity of such an act is entirely within the discretion of the Legislature, and its decision cannot be reviewed by the courts.

**11. CHARITIES—BEQUESTS—CONSTRUCTION.**

A bequest of a residuary estate to a charitable corporation, to be held by it for the purposes of the incorporation thereof, the principal to be kept invested and the income expended for the charitable purposes of the corporation, is an outright gift to charitable uses, and therefore is not against public policy or the statute against perpetuities.

**12. WILLS—TESTAMENTARY TRUST.**

Where a trust is created by will, a secret trust cannot be fastened thereon unless it arises from the intent of the testator and from the promise or acquiescence of the legatee.

**13. SAME—SUSPENSION OF ALIENATION.**

Testator provided for the payment of annuities to six persons. None of them were charged on any land or specific funds, but the executors were simply directed to pay such annuities in installments. *Held*, that the trusts created for the benefit of such annuitants did not involve an unlawful suspension for the power of alienation.

**14. SAME.**

Testator devised certain lands in trust to apply the income to a fixed amount for the use of the beneficiary until he arrived at the age of 25 years, thereafter for a certain amount annually to his use during life, and to apply a portion of said income to another beneficiary during her natural life, and charged such land and the necessary amount thereof with each annuity payable under testator's will, and provided that except to such an extent the premises and the proceeds and revenue thereof should be applied to the same purposes as provided in respect to the residuary estate. *Held*, that the property was tied up for two lives only.

**15. SAME.**

Testator devised certain leasehold lands in trust to apply the net income to the use of a beneficiary named. *Held*, that such property was tied up for one life only.

**16. SAME—PAYMENT OF ANNUITIES.**

The will authorized the executors to invest such sums as, in their discretion, they deemed necessary to secure payment of annuities provided for in the will, and that whenever any fund set apart or provided for that purpose ceased to be needed it should be disposed of in the manner provided for in respect to the residuary estate. *Held*, that the annuities could be paid out of the general estate or by the setting apart of specific sums.

**17. SAME—SUSPENSION OF ALIENATION.**

Testator may, on the creation of a trust, suspend the absolute power of alienation of the trust estate for the period of two lives then in being, and during such period provide for the distribution of the income among as many different persons and for as many successive lives as he sees fit.

**18. SAME.**

A trust to pay income creates a suspension of the power of alienation, while under a trust to pay annuities the latter are releasable and assignable, and do not occasion suspension of alienation.

Action by Isaac P. Smith, executor of Charles G. Havens, against the Havens Relief Fund Society and others to construe a will. Judgment rendered.

Stikeman & Silber, for plaintiff.

F. W. Stevens, for defendants Amelia W. Stephens and C. G. Stephens.

Signor & Wage (James Taylor Lewis, of counsel), for defendant Elizabeth Royce Sawyer, individually and as executrix of Charles Sawyer.

Herbert Reed (James Taylor Lewis, of counsel), for defendant Ellen King.

Newell, Chapman & Newell, for defendant Charlotte A. W. Costello.

Kellogg & Van Hoesen, for defendants H. Clark, Elizabeth B. Clark, and Mary A. Littlejohn, personally and as executrix; also for defendants Glover, Stanley, Valentine, Parmley, Brigham, and Reed.

William J. Mantanye, for defendants Du Ray Hunt, J. Warren Hunt, Esther A. Hunt, Corrie H. Chapman, Myra W. Hunt, Lotta Hunt Murray, personally and as executrix, etc., of De Forrest Hunt, deceased, Esther A. Hunt and Alburtis A. Carley, as executors, etc., of Daniel Delos Hunt, deceased, and Harriet Perkins.

Clark & Vedder (Thomas D. Rambaut, of counsel), for defendant Beekman Hunt.

Francis S. Hutchins (C. L. A. Rue Munson, of counsel), for defendants George W. Havens, Charles M. Havens, De Ray Smith, E. A. Smith, Patrick J. Delchanty, and Adaphene Armstrong.

Leonard S. Wheeler (George B. Abbott, of counsel), for Havens Relief Fund Soc.

George B. Abbott, for defendant W. H. H. Moore.

LEVENTRITT, J. The plaintiff prays the judgment of the court construing the will of his testator. The defendants comprise, on the one hand, the direct beneficiaries, and on the other the heirs and next of kin or their representatives, who would take as in the case of intestacy in the event of the invalidity of the trusts or gifts created by the instrument.

The general scheme of the will, which is long and elaborate, may be briefly stated. After making a number of bequests that are unattacked, nine annuities are provided for, while the bulk of the estate passes under the residuary clause to the Havens Relief Fund Society, with a substitutional unconditional gift to certain designated persons in the event of the society's disability to take. The annuities are attacked on the ground that the trusts created to provide them unduly suspend the power of alienation; the gift to the Havens Relief Fund Society is asserted to be void because that society, never having attained a valid corporate existence, had no capacity to take; and the substitutional gift over is declared to fail because by evidence dehors the will a secret trust is alleged to have been created. The defendants who contest the validity of the will are met by a large number of preliminary objections, some of them indeed serious. I have deemed it wiser, without being unmindful of the important bearing they might have on the issues, to brush aside what may be termed the strictly technical objections, and to consider the will on its merits. Charles G. Havens, the testator, a retired lawyer, died at the city of New York, on the 7th day of January, 1888, possessed of a large fortune. His will was admitted to probate

as a will of real and personal property in September of that year, and letters testamentary duly issued to Clifford A. Hand, who acted thereunder until the 17th day of August, 1901, when he died. In October, 1901, letters were issued to the plaintiff, who has since acted as sole executor and trustee.

The clauses of the will that have bearing on the present controversy are the following:

By the fifth clause of the will the executors are directed to pay an annuity of $100 to Emma Smith. By similar provisions in the thirteenth and fourteenth clauses annuities ranging from $100 to $250 are given to Harriet S. Allen, Maria L. Walton, Harriet Perkins, and Lucinda Whitford, and by the nineteenth clause an annuity of $1,000 is given to William Tilden. The provisions for these six annuities are substantially similar. None of them is in terms charged on any lands or specific fund, but the executors are simply directed to pay them in certain installments. Three other annuities are created by the sixth and seventh clauses which stand on a different basis.

By the sixth clause the testator gives and devises certain lands and premises situated at Broadway and Thirtieth street, in the city of New York, to his executors upon trust to receive and collect the rents, issues, and profits of the said lots of land and premises, and after paying from the same any necessary and proper charges upon the property to apply the net income derived therefrom to the purposes following, namely:

"My said executors are directed to apply such net income to the extent or limit of twelve hundred dollars per year to the use of my namesake, Charles G. H. Stephens, son of Amelia W. and Edgar W. Stephens, from and after my decease until he attains the age of twenty-five years and thereafter to the limit or extent of one thousand dollars per year to the use of the said Charles G. H. Stephens during his remaining natural life. And I also direct my executors to apply the said net income to the limit or extent of six hundred dollars per year to the use of Charlotte A. W. Tilden, the adopted daughter of my deceased namesake, Charlietta G. H. Tilden, during her remaining natural life in the manner however and subject to the conditions provided in the sixteenth article of this my will. And subject to the preceding provisions of this article and to the extent that it is within my power so to do I charge upon the said lands and premises and upon the net income thereof each and every the annuities payable under this my will. * * * And subject to the provisions of this item of my will and except in so far as the said lands and premises or the income thereof shall be actually applied or used to and for the satisfaction of such provisions I direct that the same disposition be made of the said lands and premises and of all proceeds and revenue thereof as is hereinafter directed for and in respect of my residuary estate."

By the seventh clause certain leasehold lands and premises situated at Fourth avenue and Nineteenth street are devised and bequeathed upon a trust similar to that in the sixth paragraph to apply the net income to the extent of $1,000 a year to the use of Amelia W. Stephens for life. Power is given to secure a renewal of the lease, which expires in 1910, or to purchase the fee, in which event the lands so purchased are made subject to the provisions of this seventh clause:

"And subject to the provisions of this item of my will and except in so far as the said leasehold lands and premises or the fee if acquired thereof shall be actually applied or used to and for the satisfaction of such provisions I direct that the same disposition and application be made of the said lease-

hold lots of land and premises or the fee if acquired thereof and of all proceeds and revenue thereof as is hereinafter directed for and in respect of my residuary estate. And in case and to the extent that the income so applicable to the use of the said Amelia W. Stephens shall not be equal to the annual sum of one thousand dollars throughout the period of her natural life from and after my decease then and in such case and out of my general estate my executors are directed to make good and pay in quarterly or other convenient installments the deficiency or amount necessary to ensure to her such annual sum."

The seventeenth clause of the will makes general provision for all the annuities in the following language:

"My executors are authorized to set apart and safely invest and keep invested such sums as in their reasonable discretion they shall deem proper to secure payment of the hereinbefore mentioned annuities and annual sums and meet any of the provisions of this my will except and to the extent that the same are hereinbefore adequately provided for. And whenever and as each or any fund set apart or provided for these purposes ceases to be needed therefor I direct that the same disposition or application be made of the same or of any remainder thereof as is hereinafter provided for or in respect of my residuary estate."

Of the annuitants mentioned, Allen, Walton, Whitford, and Tilden are dead. The leasehold premises on which the Stephens annuity is made a primary charge have been run at a loss. They do not yield any net rent. Their value is continually decreasing, the leasehold having only six years more to run, and the fee is not purchasable.

The testimony shows that the testator exhausted but a very small portion of his property in the bequests and the provisions for the annuities. The great bulk of his estate is sought to be passed either under the twentieth or twenty-first clauses which read as follows:

"Twentieth. All the rest, residue and remainder of my estate and property, real and personal and wheresoever situate of or to which I may die seized, possessed or entitled I give devise and bequeath the same to my said executors upon trust to sell and dispose of the same and convert the same into cash or cash securities or investments and pay over the net proceeds thereof to the 'Havens Relief Fund Society' a corporation organized under the laws of the State of New York (of which I am and from its beginning have been a trustee) to be held and applied by the said Society for the purposes of the incorporation thereof it being my wish however that the principal be kept invested and only the income distributed or expended for the charitable purposes of the Society. And in this residuary property shall pass and be included all estate and funds and property which by decease of legatees or from other cause shall not be actually required to satisfy the hereinbefore contained provisions of this my will and all principal sums which shall cease to be required to produce and pay annuities or other charges or sums.

"Twenty-first. In case by disability of the beneficiary or from other cause the last preceding clause or item shall fail to take effect so as to pass to or to the use of the said 'Havens Relief Fund Society' my residuary estate or the proceeds thereof or all or any part or parts of the same I give devise and bequeath said residuary estate and any and every part thereof which shall fail to be actually applied to the purposes indicated in the last preceding item of my will unto the persons named and who first qualify as my executors and John D. Jones and William H. H. Moore and the survivors and survivor of them absolutely and in fee. And this devise and bequest is in the confident belief that they will apply any estate and property so vesting in them in accordance with my wishes but is intended to be unconditional and free from any legal trust or obligation qualifying their absolute title."

The twenty-second clause appoints executors, first nominating Charles B. Moore and Clifford A. Hand, to be succeeded in the event of death

or disability by the plaintiff and three others. The wish is expressed that Mr. Hand should, in the first instance, alone qualify and act as executor and trustee, unless Mr. Moore should see fit to join him, and that, in case Mr. Hand should cease or decline to act, then the plaintiff should qualify and act alone. Provision is made that if the office should become vacant, and not be filled in the manner indicated, the New York Life Insurance & Trust Company should be executor and trustee.

The twenty-third clause grants a very broad power of sale as to all the real estate of which the testator "may die seized: * * * provided however that the power of sale or mortgage or leasing given by this item of my will shall not be exercised so as to prejudice or limit the trusts and provisions contained in the preceding items of my will respecting my real estate on Thirtieth Street or on Fourth Avenue and Nineteenth Street. * * * And I also specially authorize my executors in their discretion and in case it shall seem to them necessary or most expedient to do so to sell and transfer my leasehold lots and premises mentioned in the seventh item of my will and in that case they are to invest and hold the proceeds upon and for the same trusts and purposes as are provided in respect to the said premises." Express power is given to exercise the power of sale in the form of a conveyance to "The Havens Relief Fund Society" for nominal or other consideration.

The twenty-fourth clause declares the intent that the result be no intestacy as to any part of the estate, and in case of the invalidity of any provision the property which might therefor be claimed by heirs or next of kin should go to the Havens Relief Fund Society, or, in the event of its disability, to the persons designated in the twenty-first clause.

A codicil is annexed to the will and executed concurrently with it, which has no bearing on the present controversy, as it was intended to become effective only in the event that the testator died within two months of its execution. The will is dated the 20th day of July, 1886, while the testator died on the 7th day of January, 1888.

I believe I have cited with sufficient detail all the provisions of the will that have any bearing on the questions raised on the trial. Such reference to the evidence as may be necessary will be made hereafter.

The fundamental question in this case centers in the twentieth clause. Is the gift to the Havens Relief Fund Society valid? The obvious intent of the testator was that it should be the ultimate and chief beneficiary. If the twentieth clause makes legal disposition of the residuary estate, the validity of the substitutional gift in the twenty-first clause becomes a question for academic discussion merely. Naturally, therefore, the primary attack of the heirs and next of kin is directed against the gift to the society. Briefly, the argument in support of their claim, stated in one way or other in the various briefs, reduces itself to this: The attempted incorporation of the society by the certificate filed for that purpose was void, it not being for any of the purposes provided by law. It was, in effect, a trustee corporation, created as part of a testamentary scheme with objects that were wholly uncertain, indefinite, and void. Having no valid legal existence, it could not take property of any kind in any manner, and a subsequent special act of the Legislature assuming to extend the limit to the amount of property the society

could take or hold did not recognize the validity of the incorporation, or infuse validity into it, inasmuch as it must be assumed that the Legislature was merely extending the power of an existing corporation, and did not contemplate the creation of a new legal entity.

I fail to find this argument supported either by reason or authority. Preliminarily it may be observed that the argument that the formation of this society was part of the testamentary scheme fails. The society had its inception in 1871. The testator died in 1888. It may be conceded that the society was incorporated so that the testator might leave to it the bulk of his property in consummation of a long-cherished plan of original and novel charitable disposition consonant with his view of existing charitable needs. It may also be conceded that the testator made many wills from 1871 to 1886, and that each contained clauses substantially similar to the twentieth and twenty-first of his last will. But when we speak of a testamentary scheme we can consider only the intent of this last will. Brown v. Quintard, 177 N. Y. 75, 69 N. E. 225. The prior ones have ceased to be his testament. The society which he caused to be incorporated had been in existence for almost two decades when he died, and for fifteen years when his will was executed. The testimony shows that during his lifetime he had given it money in excess of $25,000. Under such circumstances the argument that the society, incorporated in 1871, was part of the testamentary scheme of 1886, becomes pointless.

Now, as to the main question. I am of the opinion that the Havens Relief Fund Society is a duly constituted domestic corporation. The incorporators assumed to organize under chapter 319, p. 447, of the Laws of 1848. Section 1 of that act provided that:

"Any five or more persons of full age, citizens of the United States, a majority of whom shall be citizens of this state, who shall desire to associate themselves for benevolent, charitable, scientific or missionary purposes, may make, sign and acknowledge * * * a certificate in writing in which shall be stated * * * the particular business and objects of such society."

The statute does not define the terms "benevolent" or "charitable." It does not limit the statement of the business or objects with reference to those terms, and it contains no declaration of public policy limiting the very broad terminology used. We have no legislative definition of charity in this state since the repeal of the statute of charitable uses (Fowler, Charitable Uses, Trusts & Donations, 69), and such judicial interpretation as is to be deduced from the cases would seem to define that as a charity which contemplates a public benefit, or the well-being of a community or a class, as contrasted with the beneficial use for a private purpose or for a private individual. "To constitute a charity, the use must be public in its nature." Sherwood v. American Bible Society, 1 Keyes, 561, 566. It seems to me that the statement of the "particular business and objects" of the Havens Society falls within the definition. The certificate, which was executed on the 31st day of December, 1870, and filed, approved by a justice of the Supreme Court, according to law, in the office of the Secretary of State, on the 3d day of January, 1871, states the purposes as follows:

"That the particular business and objects of such society shall be the receipt of such money and property as shall be voluntarily contributed, paid,

conveyed, devised, bequeathed or in any way transferred to the society and the investment of the same to produce an income, and the application of the income from time to time through corporate or private agencies to the relief of poverty and distress, and especially the affording of temporary relief to unobtrusive suffering endured by industrious or worthy persons, but including the bestowal and distribution of any part of such income to and among benevolent and charitable institutions, objects or persons, such as shall be deemed most useful and deserving or judicious, considering the different modes of application and expenditure or use of funds, and the practical results, and including the right to employ and superintend almoners, without being required or undertaking to act immediately or directly as almoners, and generally in respect to any property received by deed or will for any benevolent or charitable use or purpose, including the right to comply with the directions of the donor in regard thereto."

To call the purposes here declared anything else than benevolent or charitable seems to me to be a perversion of the ordinary and usual meaning of language.  It is claimed that this is an investment corporation.  But the investment of moneys is not given as one of the objects of the corporation.  It is not for the gain and profit of the incorporators, but solely as an incidental power for the better carrying out of the declared charitable objects.  The investment is merely for the purpose of producing an income to be applied to the corporate purposes.  "Persons seeking to form a corporation under any general law must have a reasonable latitude as to what they may insert in their certificate of incorporation.  They must insert therein all the matter particularly required by the law, and they may insert other provisions not inconsistent with law or public policy which are germane to the purposes of the corporation, and necessary, convenient, or appropriate to the accomplishment of such purpose.  If they keep within such limits, the public authorities have no reason to interfere; the interests of the public are not jeopardized, and the rights of no citizen are violated."  People ex rel. Fairchild v. Preston, 140 N. Y. 549, 552, 35 N. E. 979, 24 L. R. A. 57.  I find nothing in this certificate "inconsistent with law or public policy."  Merely because the declared purposes are very broad in their scope, and in part, perhaps, a bit indefinite, does not affect the validity of the incorporation as such.  We are not discussing gifts to charitable uses as they existed when the society was organized, and which required definite and ascertainable beneficiaries.  In the incorporation of a charitable society the law does not require that the ultimate recipients of the bounty be minutely and precisely identified.  It requires that the use shall be public; that the benefits shall be intended not for individuals as such, but as representatives of a class; that the announcement of the altruistic aim shall not be a cover for the bestowal of a private bounty.  A certain amount of indefiniteness is of the very essence of the purpose of every charitable corporation.  Broadly speaking, the present certificate contemplates the distribution of bounty directly to industrious and worthy persons, and, also directly, to charitable institutions, corporate or private.  The Havens Society remains none the less the direct dispenser of charity because it bestows its largesse on other charitable institutions.  There is no question involved, so far as I can see, of any delegation of authority.  The Havens Society does not cast the performance of its functions on others.  The corporation is invested with discretionary powers in the selection of the objects of its bounty.  It

does not delegate this power. It could not, perhaps, delegate this discretionary power of selection. The exercise of the very power of selection set forth in its certificate is in no sense a delegation of that power. The contemplated gifts are not direct to persons or to other charitable institutions. There is no room for the application of the maxim, "Delegata potestas non potest delegari." I am of the opinion that the certificate alone was sufficient to effect a valid incorporation.

If, however, I am wrong in this conclusion, I am of the opinion that the subsequent act of the Legislature with reference to the society validated the incorporation, or, alternatively, created a valid corporation in the first instance. Within four months of the filing of the certificate an act was passed, being chapter 301, p. 601, of the Laws of 1871, whose primary object, as appears from the title, undoubtedly was to remove the limit to the amount which under then existing law the corporation might take and hold, but which, in addition, shows a recognition and sanction of the powers sought to be assumed, if not an express authority. As the act is, to my mind, controlling of the question under discussion I quote it in full:

"Section 1. The Havens Relief Fund Society, incorporated under the laws of this state, and whose purposes or business and objects are the receipt of such money and property as shall be voluntarily contributed, paid, conveyed, devised, bequeathed, or in any way transferred to the society, and the investment of the same to produce an income, and the application of the income, from time to time, through corporate or private agencies to the relief of poverty and distress, and especially the affording of temporary relief to unobtrusive suffering, endured by industrious or worthy persons, and including the bestowal and distribution of any part of such income to and among benevolent and charitable institutions, objects or persons, such as shall be deemed most useful, and deserving or judicious, considering the different modes of application and expenditure or use of funds, and the practical results, and including the right to employ and superintend almoners without being required or undertaking to act immediately or directly as almoners, and generally in respect to any property received by deed or will, for any benevolent or charitable use or purpose, including the right to comply with the directions of the donor in regard thereto, is hereby authorized to receive by gift, devise, bequest, subject to all provisions of law relative to, devises and bequests by last will and testament, or other voluntary contributions, any money or property, and to so apply the same to the said purposes of its incorporation, or any or either thereof, without being limited to the amounts now limited by law, and to continue the incorporation so long as may be requisite thereto; provided, however, that the amount of such contributions which may be so received from persons other than those named in the certificate of its incorporation, shall not exceed the limit allowed by law for gifts or contributions to associations or incorporations for benevolent and charitable purposes.

"Sec. 2. This act shall take effect immediately."

It will be observed that this act contains a verbatim recital of the purposes and objects of the society as stated in the certificate, and impliedly repeats them when the society is specifically "hereby authorized" to receive any money or property and apply it "to the said purposes of its incorporation, or any or either thereof." This comes very close to an express authority to receive and use property for the named purposes. The addition of the clause, "without being limited to the amounts now limited by law," while doubtless the motive for the enactment of the statute should not, in view of the particular language adopted, be held to negative the legislative intent to permit the use of the property or

money for the "said purposes." The Legislature had all the essential facts before it. If there was any informality or irregularity in the proceedings attending the making, filing, and executing of the certificate, the recognition of the existence of the society by the act of 1871 would be deemed to have waived and cured it, as the power prescribing the formalities had the right to dispense with them. Black R. U. R. R. Co. v. Barnard, 31 Barb. 258; Syracuse City Bank v. Davis, 16 Barb. 188; White v. Ross, 15 Abb. Prac. 66. But here, so far as essentials are concerned, there is no necessity for deeming anything waived. Everything is expressed. No purpose or aim of the corporation was concealed. Every power that it specially claimed under its certificate was recited in the statute, and, in effect, repeated in the enacting clause. Even on a narrow construction it is to be said that the Legislature, apprised and approving of the corporate objects, extended the limits to take and hold for those very objects. Why, then, is this sanction not a ratification or an incorporation for those very objects? I find nothing in the existing law to the contrary. If the Legislature could by special act create such a corporation—and this I do not understand to be questioned—why should the assent given with full knowledge of the facts not have the same force and effect? "The existence of a corporation formed without legislative authority may be legalized by the subsequent assent of the Legislature. For this purpose it is not necessary that an act be passed investing the association with corporate franchises by express terms, but it is sufficient if the Legislature recognizes and thereby ratifies the franchises which have been claimed." Morawetz, Priv. Corp., § 20. It has been held, for instance, that a plain recognition by the conferring power of the capacity to take and hold land would confer that power even if it had not previously existed. Society of the Propagation of the Gospel in Foreign Parts v. Town of Pawlet, 4 Pet. 480, 7 L. Ed. 927, per Story, J. Furthermore, the act of 1871 is so complete in itself that, waiving formalities, it may be not improperly regarded as an act of incorporation, even if we take the extreme view that the certificate filed completely failed of its purpose. Unless there is a constitutional requirement, no certain forms are necessary to effect a grant of corporate franchises. No express words are requisite, but by implication a corporation may be deemed to be created. Any expression whatsoever showing the legislative intention to confer the right to exercise corporate franchises is sufficient, and "this intention may be deduced from the whole of the legislative act. The use of the word 'incorporate,' or a similar expression, is not necessary." Morawetz, Priv. Corp. § 18; Town of North Hempstead v. Town of Hempstead, 2 Wend. 109; Thomas v. Dakin, 22 Wend. 91, 102; Walsh v. Trustees of New York & Brooklyn Bridge, 96 N. Y. 427, 436.

The legislative intent in the act of 1871 must be apparent to him who reads. Had the act simply said in effect, "The Havens Relief Fund Society, incorporated under the laws of this state, is hereby authorized to take and hold property and money without being limited to the amount now limited by law," there might be some force in the argument that the Legislature was misled; that it supposed it was extending the power of a society legally incorporated; and that, if the

incorporation was void, the extension of powers that did not exist was necessarily ineffectual. But that is not this case. The Legislature was not misled. In its enactment it stated, and must, therefore, be deemed to have considered, ratified, and approved, every purpose and object of the society. It expressly authorized the society to receive and apply property without limit for the "said purposes." In the absence of constitutional inhibition, the act was equivalent to assent, if not to a formal incorporation. I find no such restriction in the state Constitution. Section 1 of article 8 provides:

"Corporations may be formed under general laws; but shall not be created by special act, except for municipal purposes, and in cases where, in the judgment of the Legislature, the objects of the corporation cannot be attained under general laws."

This provision of our Constitution has been retained unaltered from article 8, § 1, of the amended Constitution of 1846. It does not require that corporations must be formed under general laws. It is not mandatory, but permissive (Mosier v. Hilton, 15 Barb. 657; United States Trust Co. v. Brady, 20 Barb. 119; People v. Bowen, 30 Barb. 24; affirmed, 21 N. Y. 517); and it is well settled that whether a special act of incorporation is necessary or not is a matter entirely for the judgment and discretion of the Legislature, and that the courts have no power to review its action in this regard. Metropolitan Bank v. Van Dyck, 27 N. Y. 400, 448. I hold, therefore, that the Havens Relief Fund Society was a duly constituted domestic corporation. Without amplifying further, I state my conclusion to be that under the act of 1871 and the amendment of chapter 319, p. 447, of the Laws of 1848, it had the power to take and hold what the testator chose to devise and bequeath to it.

It had the capacity to take. It remains to consider briefly the gift to it. At great length the heirs and next of kin argue that the gift under the twentieth clause creates a charitable trust; that the devise and bequest is for indefinite and uncertain purposes; that the estate is to be kept invested in perpetuity, and merely the income distributed; that there are no persons or institutions sufficiently ascertained that could be held to have the right to enforce its alleged purposes or objects; and that the law in relation to charitable trusts as it existed when this will took effect and as it now exists in relation to perpetuities makes such a gift to a trustee void. The many cases cited in support of the contentions are unquestionably sound law, and not to be disregarded by an inferior court. But I find none of them applicable. The vice in the argument lies in the assumption of the creation of a charitable trust. No such trust is established. There is no gift to charitable uses. There is simply a gift outright. The testator, an experienced lawyer, evidently recognized that, since charitable donations have been subjected to the common rules against perpetuities, "corporate donees engaged in the business of charity have been regarded as the safest conduits of benevolence and benefaction" (Fowler, Charitable Uses, Trusts & Donations, 69), and that, as long since stated in Yates v. Yates, 9 Barb. 324, "Trusts are unnecessary for public charities; direct grants are much better." A gift to a charitable corporation for its corporate purposes, as here, is not a trust in the eyes of the law (Fow-

ler, supra, 72, 84; Wetmore v. Parker, 52 N. Y. 459; Vail v. Long Island R. R. Co., 106 N. Y. 283, 12 N. E. 607, 60 Am. Rep. 449; Bird v. Merklee, 144 N. Y. 544, 39 N. E. 645, 27 L. R. A. 423); and the direction that the principal be kept invested in perpetuity, and only the income used runs against no statute or public policy. The argument of the heirs on this point can best be answered by the language of the Court of Appeals in Bird v. Merklee, supra, where it is said:

"The fundamental error in this case, * * * and in cases that are frequently coming to the attention of this court, is the failure to recognize the fact that gifts to religious and charitable corporations to aid in carrying out the purposes for which they are organized, whether by expending the principal of a bequest or the income of a bequest to be invested in perpetuity, do not create a trust in any legal sense, do not offend against the statute of perpetuities, are not to be judged by any of the well-known rules pertaining to the law of trusts as applied to private individuals."

Some minor questions are raised under the twentieth clause, which I do not deem it important to consider. I have reached the conclusion that the "net proceeds" which under it the executors were to turn over to the Havens Relief Fund Society constituted a valid gift to a valid corporation empowered to take.

In this view it becomes unnecessary to consider at length whether or not the substitutional gift in the twenty-first clause creates a secret and hence void trust. A few words, however, may be said in passing. I find myself in accord with the conclusion of the surrogate, who, on admitting this will to probate, held, without discussing the twentieth clause, that the twenty-first created no secret trust. Matter of Havens, 6 Dem. Sur. 456. While his decision does not control the determination of this action, at least so far as the realty is concerned, I see no occasion to question his views. The testimony on this point was read in evidence from the probate proceedings, and nothing additional was offered. The heirs and next of kin rely on a line of cases of which Matter of O'Hara, 95 N. Y. 403, 47 Am. Rep. 53, Amherst College v. Ritch, 151 N. Y. 282, 45 N. E. 876, 37 L. R. A. 305, and Edson v. Bartow, 154 N. Y. 199, 215, 48 N. E. 541, are the leading examples. A careful consideration of those and kindred cases, applied to the facts at bar, fails to establish the offensive trust asserted. I do not propose to review the whole evidence, but merely to single out what I regard as controlling features. It is only as to Mr. Hand that a secret trust could possibly be asserted. Mr. Hand testified—and his word is not even remotely impugned—that he never saw the testator's last will until after the latter's death, and that he had no conversation with the testator about the twenty-first clause. Mr. Havens drew the will himself, and the original on file is in his handwriting. To fasten a secret trust on a fund, it must spring from the intention of the testator, and from the promise, express or implied by silent acquiescence or tacit consent, of the legatee. Amherst College v. Ritch, supra; Edson v. Bartow, supra. The only intent of the testator which we can consider is that of his last will (Brown v. Quintard, 177 N. Y. 75, 69 N. E. 225); the only promise, that made with reference to the last will. Previous instruments had ceased to be testamentary in character. But even as to these previous instruments, provided it is proper to consider them

at all, Mr. Hand testified before the surrogate that he was very positive that no promise had been made with regard to earlier provisions similar to that under discussion; that he had indicated no intention of carrying out Mr. Havens' wishes, but that, on the contrary, he had told the latter "that such a clause as that would make the legatees and devisees entirely at liberty to take the property to themselves." Mr. Hand saw the will of 1884, but was not present nor consulted about the execution of the will of 1886—the one under discussion—and stated categorically, "I did not know the contents of this will as executed until it was opened after his death." I fail to find room for any implied promise in these undisputed facts. In the Edson Case, supra, mainly relied on by the heirs and next of kin, the will and codicil were prepared under the supervision of the legal adviser of the testatrix, who attended to the execution of the codicil, made necessary by impending death, within 48 hours of his client's decease, reading it to her, and stopping at the end of each clause until she nodded assent. These seem to be the determining facts which the Court of Appeals held justified opposing inferences, and on which the Appellate Division had based its determination, binding on the higher court, that the attorney took the legacy resting under the implied promise to carry out the wishes of the testatrix. Such or similar facts are absent here. Mere knowledge on the part of Mr. Hand that the will of 1886, which he had not seen, was likely to have a provision containing a substitutional gift to him falls very short, in my opinion, of any implied promise, whatever his determination may have been as a gentleman of honor to deal with the Havens Society in a manner that would have met with the approval of his testator.

Were the twentieth clause of the will void, I should have little hesitancy in declaring the twenty-first valid.

The substantial questions involved in this contest are disposed of in the foregoing. Certain minor points should be noticed.

It is claimed that the trusts created for the benefit of the several annuitants provide for an unlawful suspension of the power of alienation, contravene the statute against perpetuities, and are therefore void. In support reference is had to the sixth clause of the will, and it is urged that the testator has charged nine annuities upon the Thirtieth street property, thus preventing its sale until the last annuitant had died, with the result that the trust created by that clause suspends the power of alienation for nine lives. The argument is unsound. The provisions with regard to the annuities are most carefully drawn, and clearly show, to my mind, a knowledge by the draftsman of the legal rules applicable, and an intent to stay within them. As has been pointed out in the summary of the will quoted, the annuities have been provided for in two ways. Three of them are to be paid by applying the net income of designated properties—two out of the net income of the Thirtieth street fee, and one out of the net income of the Nineteenth street leasehold; and the remaining six annuities by a simple direction to pay the respective sums in quarterly or other convenient installments. This difference of method indicates a difference of intent. It is not necessary to discuss the question of the alienability or inalienability of the six annuities, as they are not payable out of rents

and profits as such, or made a primary charge on anything. The provision of the sixth clause of the will, "And subject to the preceding provisions of this article and to the extent that it is within my power so to do I charge upon the said lands and premises and the net income thereof each and every the annuities payable under this my will," distinctly contemplates by the limitation "to the extent that it is within my power so to do" a situation in which these six annuities cannot be so charged, and in this aspect the provision is to be regarded not as mandatory, requiring the charge in any and every event, but merely as alternative. The testator did not attempt to tie up his property in the sixth clause beyond two lives. The net income is to be applied first to a stated amount to the use of Charles G. H. Stephens, and then to a further stated amount to the use of Charlotte A. W. Tilden. There the testator stops. At most it can be said that the power of alienation is suspended during two lives. No further application of the net income as such is directed. The subsequent provision charging all annuities on this property to the extent that was in his power discloses an unmistakable intent that, if legal rules prevent such a charge, then it shall not be made, and that the six annuities shall stand as independent gifts, supported by independent trusts if need be. If there were any doubt on this question, the seventeenth clause would remove it. There the executors are authorized to set apart such sums as they shall deem proper to secure payment of all the annuities, "except and to the extent that the same are hereinbefore adequately provided for." The Stephens and Tilden annuities are adequately provided for. The six annuities are not, if the testator had not the power to charge them. They are to be supported as independent provisions, payable out of the general estate or by the setting apart of specific sums. It is a question whether, during the lifetime of Stephens and Tilden, all the annuities may not be paid out of the surplus income. If we regard those two lives as the measuring ones, we can apply the rule stated in Schermerhorn v. Cotting, 131 N. Y. 48, 29 N. E. 980:

"A testator may, in the creation of a trust, suspend the absolute power of alienation of the trust estate for a period of two selected lives then in being; and with this limitation, during that period, he may provide for the distribution of the annual income among as many different persons and for as many successive lives as he sees fit."

That the testator adopted the particular phraseology of the sixth clause may well be taken to disclose an accurate knowledge of decided cases and a desire to provide for all contingencies. Certainly at the time the will was drawn, and perhaps even now (see Cochrane v. Schell, 140 N. Y. 516, 531–535, 35 N. E. 971, 975–977), "the line of distinction between a trust to pay annuities and a trust to apply income is often very shadowy, and the principles of discrimination do not appear to have been clearly determined." Chaplin, Suspension of the Power of Alienation, § 233. "The importance of the distinction is that the latter trusts * * * invariably occasion suspension, while annuities, in so far as they may be classified as legacies, or as successive payments of sums in gross, are releasable, and assignable, and do not occasion suspension." Id. See Hawley v. James, 16 Wend. 61; Lang v. Ropke, 5 Sandf. 363; Radley v. Kuhn, 97 N. Y.

26; Cochrane v. Schell, supra; Bull v. Odell, 19 App. Div. 605, 46 N. Y. Supp. 306. Which, if any, of these trusts is alienable, it is not necessary to discuss. The point is that the testator apparently had the distinction between the two classes in mind, and, while expressing his preference, carefully limited the trust estates created so as to run counter to no rule of law. The Thirtieth street property is tied up for two lives only, the Nineteenth street property for one life only, and the six annuities have independent provisions of sufficient legal weight to support them.

A word as to the Amelia W. Stephens annuity, charged on the Nineteenth street leasehold, is necessary. The testimony shows that the property has been run at a loss, and that the income is therefore insufficient to pay the annuity. The provision of the seventh clause that, in the event of deficiency, the amount should be insured the annuitant out of the general estate, should, therefore, be invoked, and a sum set apart by the executors pursuant to this and the seventeenth clauses.

The complaint also asks that the will be construed as to whether it directs the unlawful accumulation of income, asks for instructions as to whether the Thirteenth street property should be sold, and prays the appointment of a referee to settle the accounts of the plaintiff. So far as I can see, no question of unlawful accumulation of income is presented. No accumulation is directed by the sixth and seventh clauses, while under the twentieth unexpended income, goes at once, though necessarily at different times and in different amounts, to the Havens Relief Fund Society. So far as the sale of the Thirtieth street property is concerned, I am in accord with counsel for the society in his suggestion that this question shall be deferred until the coming in of the referee's report on the accounting, so as to give an opportunity for the fuller developments of the facts bearing on the advisability of a sale at the present time. The portions of the twenty-third clause of the will quoted permit the sale of this property, with a proviso, similar to that applicable to the Nineteenth street property, that the proceeds be held to satisfy the trusts created.

All parties join in the request for the accounting. The entry of an interlocutory judgment will therefore be directed in conformity with the views herein expressed, and providing for the appointment of a referee to take and state the accounts of the plaintiff.

Judgment accordingly.